UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VALENTINE UNDERWOOD, | Case No. 1:08 cv 00986 GSA PC |
| Plaintiff, | |
| vs. | ORDER RE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| M. NORTHCUTT, et al., | |
| Defendants | (ECF NO. 122) |

Plaintiff is a state prisoner proceeding pro se and in forma pauperis in this civil rights action pursuant to 42 U.S.C. § 1983.  The parties have consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c)(1).[1]  Pending before the Court is Defendants' motion for summary judgment.  Plaintiff has opposed the motion.[2]

I.   **Procedural History**

This action was initiated by civil complaint filed on July 17, 2008.  Plaintiff, a state prisoner proceeding pro se, filed this civil rights action pursuant to 42 U.S.C. § 1983, naming the following individual defendants:  M. Knowles; T. Arlitz; S. Frauenheim; Dr. Akanno; Kurtz; Hart; Caudillo; Playa; Meza; Urbano; Grannis; Pfeiffer; Flory; Torres; Chapman; Ethridge; J.

---

[1] Plaintiff consented to magistrate judge jurisdiction on August 11, 2008 (ECF No. 4).  Defendants consented to magistrate judge jurisdiction on May 31, 2011 (ECF No. 97).
[2] Defendants' motion for summary judgment was filed on June 29, 2012.  On July 10, 2012, the Court issued and re-served Plaintiff with the summary judgment notice required by Rand v. Rowland, 154 F.3d 952 (9th Cir. 1998), and Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988)(ECF No. 123.)  The order was re-served in response to Woods v. Carey, 684 F.3d 934 (9th Cir. 2012).

1

Whitehead; D. Schroeder; S. Lantz; S. Martin; M. Northcutt; D. Caviness; A. Trujillo; P. Truitt; J. Fambrough.

On September 25, 2009, an order was entered, finding that the complaint stated a claim against Defendants Northcutt and Martin for retaliation and against Defendants Northcutt, Martin, Caviness, Lantz, Trujillo, Truitt and Fambrough for excessive force. The complaint failed to state any other claims for relief. On October 16, 2009, Plaintiff notified the Court that he was willing to proceed only on the claims identified by the Court as cognizable. On October 21, 2009, an order was entered, dismissing Plaintiff's Eighth Amendment medical care claims against Defendants Ethridge, Kurtz and Akanno, along with Plaintiff's due process claims arising from the processing if his inmate appeals. The Court also dismissed Plaintiff's negligence claim and Plaintiff's claims arising out of his disciplinary hearing. The Court dismissed Defendants Knowles, Arlitz, Frauenheim, Whithead, Schroeder, Hart, Caudillo, Playa, Meza, Urbano, Ethridge, Kurtz, Akanno, Grannis, Pfeiffer, Flory, Torres and Chapman.

On March 17, 2010, Defendants Northcutt, Trujillo, Pruitt, Fambrough and Lantz filed an answer.[3] Defendants Caviness and Martin filed an answer on April 8, 2011. On December 9, 2011, an order was entered, dismissing Defendant Fambrough pursuant to Federal Rule of Civil Procedure 41. On February 7, 2012, Defendants Caviness, Martin, Northcutt, Trujillo and Truitt filed the motion for summary judgment that is before the Court. Plaintiff filed opposition to the motion on April 26, 2012. Defendants filed their reply on May 18, 2012.

## II.  Allegations

Plaintiff's allegations arise from incidents that occurred while he was incarcerated at Kern Valley State Prison (KVSP). On October 2, 2006, Plaintiff was placed in Administrative Segregation (AdSeg). After being released from AdSeg, Plaintiff found that some of his

---

[3] On February 7, 2010, Defendants filed a Statement of Fact of Death as to Defendant Lantz. Defendant Lantz was dismissed on July 18, 2011.

personal property had disappeared.  On November 15, 2006, Plaintiff filed an inmate appeal regarding his property.

On November 21, 2006, Defendants Northcutt and Martin approached Plaintiff because they wanted to know why Plaintiff had been talking to Lt. Whitehead the previous day.  Plaintiff told Defendants Northcutt and Martin that he told Lt. Whitehead that he was having difficulty with some of the officers, including Northcutt and Martin, since filing his inmate grievance.  Defendant Northcutt pepper sprayed Plaintiff and hit him in the face with the pepper spray can.  Defendant Martin struck Plaintiff repeatedly with his baton.  Plaintiff tried to hit back, and then lay down on the floor on his stomach.  Northcutt and Martin continued to kick and punch Plaintiff.  Several other officers rushed in and struck Plaintiff as well.  Plaintiff was pepper sprayed again, had a bag pulled over his head, and was handcuffed.  Plaintiff alleges that Defendants Caviness, Trujillo, Truitt and Fambrough kicked and struck him.

Lt.  Whitehead instructed two officers to escort Plaintiff to the medical clinic, where Dr. Dileo had Plaintiff's head, left hand and rib x-rayed.  Dr. Dileo also cleaned a bite wound on Plaintiff's right hand, gave him a tetanus shot and sutured the area above Plaintiff's right eye.  Dr. Dileo gave Plaintiff some painkillers and a vest to wear over his rib area.  Plaintiff alleges that he also had the following:  a swollen left hand, fingers and wrist; lumps all over his head; scratches and abrasions on his lower back; bruises all over his body.  He also bled from the cut above his right eye and from his nose and right hand.  Plaintiff alleges that he suffered from blurred vision, lower back pain and nose bleeds as a result of the attack.

Plaintiff alleges that he was assaulted on November 21st in retaliation for an inmate appeal he filed against Defendant Hart on November 20, 2006, and that Defendant Northcutt confiscated his mail in retaliation for the November 21, 2006, assault.  On February 4, 2007, Plaintiff filed an inmate appeal after having his incoming and outgoing mail disappear, and after finding that Defendant Northcutt had been reassigned to the mail room after the November 21, 2006, incident.

///

3

### III.    Summary Judgment Standard

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).  Under summary judgment practice, the moving party

> [always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denial of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  Rule 56(e); Matsushita, 475 U.S. at 586 n. 11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under governing law, Anderson, 477 U.S. at 248; Nidds v. Schindler Elevator Corp., 113 F.3d 912, 916 (9th Cir. 1996), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, Matsushita, 475 U.S. at 588; County of Tuolumne v. Sonora Community Hosp., 263 F.3d 1148, 1154 (9th Cir. 2001).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  Giles v. Gen. Motors Acceptance Corp., 494 F.3d 865, 872 (9th Cir. 2007).  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to

see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's notes on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Rule 56(c). The evidence of the opposing party is to be believed, Anderson, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. Matsushita, 475 U.S. at 587 (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)(per curiam)). Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. Richards v. Nielsen Freight Lines, 602 F.Supp. 1224, 1244-45 (E.D. Cal. 1985)(aff'd, 810 F.2d 898, 902 (9th Cir. 1987).

Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is not 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

## IV. **Excessive Force**

Defendants argue that Plaintiff's excessive force claim is barred by the application of the doctrine set forth in Edwards v. Balisok, 520 U.S. 641 (1997). In Edwards v. Balisok, the Supreme Court held that Heck v. Humphrey, 512 U.S. 477 (1994) applied to actions "challenging the validity of the procedures used to deprive an inmate of good-time credits . . . ." 520 U.S. at 643. Stated another way, a section 1983 claim is barred if "the plaintiff could prevail only by negating an 'element of the offense of which he has been convicted.'" Cunningham v. Gates, 312 F.3d 1148, 1153-54 (9th Cir. 2002)(citing Heck, 512 U.S. at 487 n. 6). When the section 1983 claim does not necessarily implicate the underlying disciplinary action (or criminal conviction), it may proceed. See Muhammad v. Close, 540 U.S. 749, 754-55 (2004).

Defendants' Exhibit E2 is an authenticated copy of the hearing on Plaintiff's Rules Violation Report log no. FD-06011-0055, dated January 1, 2007. Plaintiff was found guilty of a

violation of Title 15, Section 30055, of the California Code of Regulations, Battery on a Peace

Officer, a Division B offense.  The finding was based on a preponderance of the evidence

submitted at the hearing, including the following:

> 1.  The Reporting Employee's written report, wherein Correctional Officer M. Northcutt reported: "Underwood then lunged at me and struck my right eye with his left fist.  I stepped back and sprayed Underwood in the facial area with a burst of O.C. Pepper Spray.  I then attempted to force Underwood down to the floor when he struck me again with his fist on the left side of my head."

> 2.  Crime/Incident Report CDCR 837 Part C Staff Report authored by Correctional Officer D. Caviness reporting:  "Inmate Underwood was thrashing about from side to side and kicking out while attempting to get up."

> 3.  Crime/Incident Report CDCR 837 Part C Staff Report authored by Correctional Officer S. Martin reporting: "Northcutt drew his MK-90 when Underwood lunged at him striking him in the facial area.  Northcutt and I ordered Underwood to get down.  With negative results we grabbed him to attempt to take him down, when Underwood started to swing furiously out of control striking Northcutt and myself on the side and upper head area.  Counselor J. Flory responded to our assistance."

> 4.  Crime/Incident Report CDCR 837 Part C Staff Report authored by Correctional Counselor I J. Flory reporting: "I saw Inmate Underwood holding onto Officer M. Northcutt.  I ordered Underwood to get down on the ground to which he refused.  I attempted to place Underwood's left arm behind his back and take him to the ground, however I was unable to gain compliance due to his size and strength.  I was then pushed back into the wall near the B Section door at which time my glasses were knocked off my face.  Underwood struck me in the groin area with his left knee."

> 5.  Crime/Incident Report CDCR 837 Part C Staff Report authored by Correctional Sergeant S. Lantz reporting:  "I saw Officers M. Northcutt, S. Martin, and CCI J. Flory on the ground in front of the B section door struggling with Inmate Underwood.  I observed Underwood pushing himself up off the ground ignoring orders to stop resisting and cuff up."

> 6.  Crime/Incident Report CDCR 837 Part C Staff Report authored by Correctional Officer J. Urbano reporting: "I saw Inmate Underwood strike Officer M. Northcutt in the face and began swinging his clenched fist at the officers."

> 7.  Crime/Incident Report CDCR 837 Part C Staff Report authored by Correctional Officer N. Meza reporting: "I turned around and observed Inmate Underwood K84486, Officer M. Northcutt,

6

Officer S. Martin and Correctional Counselor Flory wrestling on the floor in rotunda in front of B pod door."

8.  CDC 7219 Medical Report of Injury or Unusual Occurrence completed by RN J. Key on CC1 J. Flory reflecting reddened area to the right eye.

9.  CDC 7219 Medical Report of Injury or Unusual Occurrence completed by RN F. Rodriguez on Officer S. Martin reflecting the following:  reddened area to the forehead, cut/laceration/slash to the front of the right leg, abrasion/scratch to the right arm.

10.  CDC 7219 Medical Report of Injury or Unusual Occurrence completed by RN J. Key on Officer M. Northcutt reflecting bruise/discolored/pain/reddened/swollen area to the right eye.

11.  In accordance with California Code of Regulations (CCR), Title 15, Section 3055(c), Inmates shall not willfully commit or assist another person in the commission of a violent injury to any person or persons, including self-mutilation or attempted suicide, nor attempt or threaten the use of force or violence upon another person.  Inmates shall not willfully attempt to incite others, either verbally or in writing, or by other deliberate action, to use force or violence on another person.

12.  Staff Reports listed above details Underwood striking and resisting Officers Northcutt, Martin and CC1 Flory.  I believe a reasonable person reviewing the written reports listed above would conclude Inmate Underwood committed battery on a peace officer.

13.  It is reasonable to conclude based on the evidence therefore that Underwood committed Battery on a Peace Officer and is culpable.

DISPOSITION:  Found Guilty.  Assessed One Hundred Fifty (150) days loss of behavioral/work credit consistent with the schedule provided in the California Code of Regulations (CCR), Title 15, Section 3323 (Disciplinary Credit Forfeiture Schedule) for a Division 'B' Offense.

Id.

"A state prisoner cannot use a § 1983 action to challenge the 'fact or duration of his confinement,' because such an action lies at the 'core of habeas corpus.'" Simpson v. Thomas, 528 F.3d 685, 693 (9th Cir. 2008)(quoting Preiser v. Rodriguez, 411 U.S. 475, 489 (1973)).  Thus, where a § 1983 action seeking damages alleges constitutional violations that would necessarily imply the invalidity of a conviction or sentence, the prisoner must first establish that the

underlying sentence or conviction has already been invalidated on appeal, by a habeas petition, or terminated in his favor via some other similar proceeding.  Heck, 512 U.S. at 438-37.  This "favorable termination" rule applies to prison disciplinary proceedings, if those proceedings resulted in the loss of good-time or behavior credits.  Balisok, 520 U.S. at 646-48 (holding that claim for monetary and declaratory relief challenging validity of procedures used to deprive prisoner of good-time credits is not cognizable under § 1983); see also Wilkinson v. Dotson, 544 U.S. 74, 81-82 (2005)(explaining that "a state prisoner's § 1983 action is barred (absent prior invalidation) no matter the relief sought (damages or equitable relief), no matter the target of the prisoner's suit (state conduct leading to conviction or internal prison proceedings) if success in that action would necessarily demonstrate the invalidity of confinement or its duration" (emphasis omitted)).  Stated another way, a § 1983 claim is barred if the "plaintiff could prevail only by negating 'an element of the offense of which he has been convicted.'"  Cunningham v. Gates, 312 F.3d 1148, 1153-54 (9th Cir. 2002)(citing Heck, 512 U.S. at 487 n. 6).  However, when the § 1983 claim does not necessarily implicate the underlying disciplinary action (or criminal conviction), it may proceed.  See Muhammad v. Close, 540 U.S. 749, 754-55 (2004).

In several cases, the Ninth Circuit has applied Heck's favorable termination requirement to consider, and sometimes preclude, excessive force claims brought pursuant to 42 U.S.C. § 1983.  For example, in Cunningham, the Ninth Circuit found § 1983 excessive force claims filed by a prisoner who was convicted of felony murder and resisting arrest were barred by Heck because his underlying conviction required proof of an "intentional provocative act" which was defined as "not in self-defense."  312 F.3d at 1152.   A finding that police had used unreasonable force while effecting the plaintiff's arrest, the court held, would "call into question" the validity of factual disputes which had necessarily already been resolved in the criminal action against him.  Id. at 1154.  However, in Smith v. City of Hemet, 394 F.3d 689 (9th Cir. 2005), the Ninth Circuit considered whether excessive force allegations of a prisoner who pled guilty to resisting arrest pursuant to Cal. Penal Code § 148(a)(1) were also barred by Heck and found that "Smith's § 1983 action was not barred . . .  because the excessive force may have been employed against

8

him subsequent to the time he engaged in the conduct that constituted the basis for his conviction." Id. at 693.  Under such circumstances, the Ninth Circuit held Smith's § 1983 action "neither demonstrated nor necessarily implied the invalidity of his conviction."  Id.; see also Sanford v. Motts, 258 F.3d 1117, 1120 (9th Cir. 2001)("If the officer used excessive force subsequent to the time Sanford interfered with the officer's duty, success in her section 1983 claim will not invalidate her conviction.  Heck is no bar."); Hooper v. County of San Diego, 629 F.3d 1127, 1134 (9th Cir. 2011)(holding that a conviction for resisting arrest under Cal. Penal Code § 148(a)(1) does not "bar a § 1983 claim for excessive force under Heck if the conviction and the § 1983 claim are based on different actions during 'one continuous transaction'").

Here,  unlike the defendants in Cunningham, Defendants have not shown that Plaintiff's excessive force claims against them are necessarily inconsistent with his adjudication of guilt for battery on a peace officer.  Thus, this court cannot say that Plaintiff's excessive force claims "necessarily imply the invalidity" of his battery conviction.  Heck, 512 U.S. at 487.  The factual context in which the force was used is disputed.  Thus, even though Plaintiff was found guilty of willfully committing a violent injury upon a peace officer by hitting Northcutt in the eye, Defendants Northcutt, Martin, Caviness, Trujillo and Truitt could, if Plaintiff's testimony is believed, nevertheless be found liable for responding "maliciously and sadistically" with the intent to cause him harm.  See Hudson v. McMillian, 503 U.S. at 1, 7 (1992); Simpson v. Thomas, No. 2:03-cv-0591 MCE GGH, 2009 WL1327147 at *4 (E.D. Cal. May 12, 2009)(success on the plaintiff's Eighth Amendment excessive force claim would not necessarily invalidate his battery conviction pursuant to Cal. Code Regs., tit. 15 § 3005(c) because "even if Defendant acted unlawfully by using excessive force, Plaintiff could still have been guilty of battery"); accord Gipbisn v. Kernan, No. CIV S-07-0157 MCE EFB P, 2011 WL 533701 at *5-6 (E.D. Cal. 2011); Gabalis v. Plainer, No. CIV S-09-0253-CMK, 2010 WL 4880637 at *7 (E.D. Cal. 2010)("It is possible for defendants to have used excessive force and for plaintiff to have attempted to assault a correctional officer.  Thus, success on plaintiff's civil rights claims would not necessarily imply that the guilty finding and resulting loss of good-time credits is invalid.");

9

Candler v. Woodford, No. C 04-5453 MMC, 2007 WL 3232435 at *7 (N.D. Cal. Nov. 1, 2007)("Because defendants have not shown that a finding of their use of excessive force would necessarily negate an element of the battery offense, the Court cannot conclude that plaintiff's claims are barred under Heck").  Defendants' motion should therefore be denied on the ground that Plaintiff's excessive force claim is barred by Heck.

## V.    **Retaliation**

Plaintiff alleges that he was assaulted on November 21, 2006, in retaliation for an inmate appeal he filed against Hart on November 20, 2006, and that Defendant Northcutt confiscated his mail in retaliation for the November 21, 2006, assault.  On February 4, 2007, Plaintiff filed an inmate appeal after having his incoming and outgoing mail disappear, and after finding that Defendant Northcutt had been reassigned to the mailroom after the November 21, 2006, incident.

Allegations of retaliation against a prisoner's First Amendment rights to speech or to petition the government may support a 1983 claim.  Rizzo v. Dawson, 778 F.2d 5527, 532 (9th Cir. 1985); see also Valandingham v. Bojorquez, 866 F.2d 1135 (9th Cir. 1989); Pratt v. Rowland, 65 F.3d 802, 807 (9th Cir. 1995).  "Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal."  Rhodes v. Robinson, 408 F.3d 559, 567-68 (9th Cir. 2005); accord Watison v. Carter, 668 F.3d 1108, 1114-15 (9th Cir. 2012); Brodheim v. Cry, 584 F.3d 1262, 1269 (9th Cir. 2009).

An allegation of retaliation against a prisoner's First Amendment right to file a prison grievance is sufficient to support a claim under section 1983.  Bruce v. Ylst, 351 F.3d 1283, 1288 (9th Cir. 2003).  The Court must "'afford appropriate deference and flexibility' to prison officials in the evaluation of proffered legitimate penological reasons for conduct alleged to be retaliatory." Pratt v. Rowland, 65 F.3d 802, 807 (9th Cir. 1995)(quoting Sandin v. Conner, 515 U.S. 472, 482

(1995)).  The burden is on Plaintiff to demonstrate "that there were  no legitimate correctional

purposes motivating the actions he complains of."  Pratt, 65 F.3d at 808.

Defendant Northcutt's declaration establishes the following:

> My sole motivation for using force against inmate Underwood on November 21, 2006 was to halt Underwood's attack upon Officer Martin and me, and to gain control of him.
>
> During my interaction with inmate Underwood on November 1, 2006, I was unaware of any of Underwood's inmate grievances and I was in no way motivated by any of Underwood's inmate grievances.
>
> I did not process, nor did I have any involvement in the handling of, a grievance filed by inmate Underwood on October 24, 2006.
>
> I did not process, nor did I have any involvement in the handling of, a grievance filed by inmate Underwood on November 15, 2006.
>
> I did not process, nor did I have any involvement in the handling of, inmate Underwood's grievance log no. KVSP-O-06-03693.
>
> After the November 21, 2006, incident involving inmate Underwood, I was involved in another incident on January 1, 2007, where I used force to subdue an assaultive inmate (not Underwood).
>
> Following the January 1, 2007, incident, correctional staff instituted an investigation and on January 3 or 4, 2007, I was re-assigned to work in the mailroom pending the investigation's outcome.
>
> Once the investigation into the January 1, 2007, incident was completed, in June 2007, I returned to my regular position.
>
> Under prison procedure, any time a correctional staff member is accused of using force or retaliating against an inmate, that staff member is prohibited from handling the accusing inmate's mail.
>
> When I transferred to the mailroom in January 2007, the mailroom supervisors instructed me not to handle any of inmate Underwood's mail.
>
> I did not handle any of inmate Underwood's mail during the time I worked in the mailroom from January 3 or 4 through June, 2007.
>
> I have never engaged in any retaliatory conduct against an inmate in response to an inmate filing a grievance or complaining about me to other correctional staff members.

11

(Northcutt Decl. ¶¶ 21-32).  Defendant Northcutt's declaration establishes the lack of existence of a triable issue of fact regarding whether he retaliated against Plaintiff for filing an inmate grievance.  Defendant Northcutt's declaration establishes that he was unaware of the grievance filed by Plaintiff, and therefore could not have been motivated by Plaintiff's grievance. As will be discussed below, while there is a triable issue of fact as to whether the force used was excessive, there is no dispute that, other than the initial burst of pepper spray, Defendant Northcutt was responding to resistance by Plaintiff.  While Plaintiff argues that Northcutt's actions in using force were taken in retaliation for the exercise of Plaintiff's rights, he comes forward with no evidence establishing that Northcutt was aware of the grievance filed by Plaintiff.

Northcutt's declaration also establishes that he did not handle any of Plaintiff's mail, and that he was instructed not to handle any of Plaintiff's mail.  There is therefore evidence establishing the lack of existence of a triable issue of fact – Northcutt could not have been responsible for any loss of Plaintiff's mail.  That Plaintiff's mail may have been lost while Northcutt was assigned to the mailroom does not subject him to liability for retaliation. Plaintiff's conclusory allegation is not supported by evidence.  Plaintiff has not come forward with evidence establishing that Defendant Northcutt handled any of Plaintiff's mail, or engaged in any conduct that caused the loss or interference with Plaintiff's mail.

Defendant Martin's declaration establishes the following:

> While Officer Northcutt and I counseled inmate Underwood about his behavior, Underwood alleged that correctional staff had confiscated and destroyed his personal property and called and harassed his family.
>
> Officer Northcutt informed Underwood that these allegations were untrue.
>
> Inmate Underwood then became visibly upset that these allegations were untrue.

Inmate Underwood then became visibly upset and began speaking and yelling loudly.

After Inmate Underwood became upset and began speaking and yelling loudly, Officer Northcutt drew his pepper-spray container.

After Officer Northcutt drew his pepper-spray container, inmate Underwood lunged at Northcutt and punched Northcutt in the face.

When Inmate Underwood lunged at Officer Northcutt, I stepped back while Officer Northcutt pepper-sprayed Underwood in the face.

In an effort to halt inmate Underwood's assault and gain control of him, Officer Northcutt and I attempted to force Underwood to the floor.

As Officer Northcutt and I attempted to force inmate Underwood to the floor, he punched me on the head.

After inmate Underwood punched me on the head, Correctional Counselor Flory responded to the scene and assisted Officer Northcutt and me in forcing Underwood to the floor.

Once inmate Underwood was on the floor, he refused repeated orders to place his hands behind his back, Officer Northcutt, Counselor Flory, and I attempted to pull Underwood's arms behind his back.  But we were unable to do so because of Underwood's size and strength.  At the time, Underwood was approximately 290 pounds, and he was so strong that correctional staff, including me, could not control him.

After I unsuccessfully attempted to place inmate Underwood's arms behind his back, I began coughing and felt light-headed from the pepper-spray exposure, and so I left the scene and went outside to decontaminate from the pepper-spray exposure.

My sole motivation for using force against inmate Underwood on November 21, 2006, was to halt Underwood's attack upon me and Officer Northcutt, and to gain control of Underwood.

During my interaction with inmate Underwood on November 21, 2006, I was in no way motivated by any of Underwood's inmate grievances.

I did not process, nor did I have any involvement in the handling of, a grievance filed by inmate Underwood on October 24, 2006.

I did not process, nor did I have any involvement in the handling of, a grievance filed by inmate Underwood on November 15, 2006.

I have never engaged in any retaliatory conduct against an inmate
in response to an inmate filing a grievance or complaining about
me to other correctional staff members.

(Martin Decl. ¶¶5-21).  Defendant Martin's declaration establishes that he was not involved in handling or processing Plaintiff's inmate grievances, and that his sole motivation in using pepper spray on Plaintiff was to maintain order and discipline.  As will be noted below in the context of qualified immunity, a triable issue of fact exists as to whether the force used was excessive.  There is no dispute, however, that Plaintiff was agitated about his belief that correctional staff had destroyed his personal property and called and harassed his family.  There is no dispute that Plaintiff verbalized that frustration to Defendant Martin.  Plaintiff has not come forward with any evidence that Defendant Martin used excessive force on Plaintiff in retaliation for filing inmate grievances.

## VI.    Qualified Immunity

Defendants argue that they are entitled to qualified immunity on the ground that they violated no constitutional right.  In resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry.  The first asks whether the facts, "[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a [federal] right."  Saucier v. Katz, 533 U.S. 194, 201 (2001).  The second prong of the qualified immunity analysis asks whether the right in question was "clearly established" at the time of the violation.  Hope v. Pelzer, 536 U.S. 730, 739 (2002).  Governmental actors are "shielded from liability for civil damages if their actions did not violate 'clearly established or statutory or constitutional rights of which a reasonable person would have known.'"  Id.  "[T]he salient question . . . is whether the state of the law" at the time of an incident provided "fair warning" to the defendants "that their alleged [conduct] was unconstitutional."  Id. at 741.

Courts have discretion to decide the order in which to engage these two prongs.  Pearson v. Callahan, 555 U.S. 223, 236 (2009).  But under either prong, courts may not resolve genuine

disputes of fact in favor of the party seeking summary judgment.  <u>Tolan v. Cotton</u>, 572 U.S. ___ (2014)(per curiam).

Defendants argue that under the second prong – whether a reasonable person in Defendants' positions could have believed their conduct was lawful – the disputed facts indicate that the answer is yes.  Defendants' evidence establishes the following:

1.  In an effort to halt Plaintiff's assault, Northcutt and Martin stepped back, and Northcutt pepper-sprayed Plaintiff in the face.  (Northcutt Decl. ¶ 12; Martin Decl. ¶ 10; Rules Violation Report log no. FD-06-11-0055, p. 1.)

2.  In an effort to halt Plaintiff's assault and gain control of him, Defendants Northcutt and Martin attempted to force Plaintiff to the floor.  (Martin Decl. ¶11; Northcutt Decl. ¶ 13; Rules Violation Report log no. FD-06-11-0055, pp. 1-2; Incident Report log no. KVP-FDP-06-11-0530, p. 21.)

3.  Defendant Trujillo responded to the scene and, to prevent Plaintiff from standing up and continuing his assault, placed his upper body on top of Plaintiff's legs and assisted Counselor Flory in placing Plaintiff's arms behind his back.  (Incident Report log no. KVP-FDP-06-11-0530, pp 30-31.)

4.  To prevent Plaintiff from standing up and continuing his assault, Defendant Caviness struck Plaintiff once in the left rib area with his baton.  (Caviness Decl. ¶ 5; Incident Report log no. KVP-FDP-06-11-0530, pp. 13, 31.)

5.  Defendant Caviness ordered Plaintiff to stop resisting, but Plaintiff refused and continued to attempt to stand up.  (Caviness Decl. ¶ 6; Incident Report log no. KVP-FD-06-11-0530, pp. 13,31.)

6.  To prevent Plaintiff from standing up and continuing his assault, Defendant Caviness again struck Plaintiff's left rib area with his baton.   (Caviness Decl. ¶ 7; Incident Report log no. KVP-FD-06-11-0530, pp. 13, 31.)

7.  To prevent Plaintiff from standing up and continuing his assault, Defendant Northcutt struck Plaintiff twice in the back with his forearm.  (Northcutt Decl. ¶20; Rules Violation Report

15

log no. FD-06-11-0055, p. 2.)

8.   Defendants Northcutt and Martin's sole motivation for using force against Underwood was to halt Underwood's attack upon them and gain control of him.  (Northcutt Decl. ¶ 21; Martin Decl. ¶ 18.)

Defendants' evidence clearly establishes that a reasonable person in Defendants' positions could have believed their conduct was lawful.  Defendants were only acting in self-defense and to prevent Plaintiff from standing up and continuing his assault.   The burden shifts to Plaintiff to come forward with evidence establishing a triable issue of fact as to whether he was subjected to excessive force.

Plaintiff recounts his version of the event in his deposition testimony:

> Lieutenant Whitehead assured me that it would be done, that he was going to get me – move me out of there.  And basically, what I explained to Northcutt and Martin was my desire to be moved out of the building.

> Northcutt started looking up at the gun tower.  He started peeping at the gunner.  We were in the rotunda area where you have an open tourniquet [sic] where the gun is, so I'm aware of the environment that I'm in.

> I asked him once again, I felt uncomfortable because he kept looking up to get the gunner's attention.  And I seen him looking over at - he looked over at his right to Martin and kept looking up at the gunner.  I said again, can you open the door so I can go back to my cell?

> Martin – CO Martin says, look here.  When I looked, that's when Northcutt sprayed me with the big pepper spray can, the very large can and he – when he sprayed me, I wear contact lenses, I put my head down to get my eyes because I couldn't see and I was hit in the head with the pepper spray can – with a metal object, which later I found out was the pepper spray can.  I didn't see it, but I heard the ringing of a metal can hit my face.

> Q.  Okay.  Can I stop you for just a second and ask you a couple of questions about what you told me so far?

> A.  Yes.

> Q.  Okay.  When Officers Northcutt and Martin approached you, where were they standing while you guys were having this conversation?

16

A.  I took approximately two steps within the rotunda area from the B section door, they were standing in front of me.  One of them was kitty cornered with the correctional officer's office.  The other was basically kitty cornered with the CC-1 office.  The CC-1 door was open the whole time this conversation was going on.

They were basically in front of me where there was nowhere I could go back because the door was shut, there was no way I could walk out of the building because they were in front of me.

Q.  And by standing – by both of them standing in front of you, which officer was closer to your right side?

A.  To my right in front of me – on the right side in front of me was CO Northcutt, to the left was  CO Martin.

Q.  Okay.  And so when – I'm just  - I'm kind of clarifying something in my notes.  Okay.  When Officer Martin said, look here, that – that made you turn your head to the left, is that correct?

A.  Yes.  What I did was I looked over to my left because he was to my left.  Northcutt was under the gun tower where you can see the gunner.  The gunner has access over top of us because you have a – an open compartment for the gunner in that area.  So he kept looking up at the gunner.  When he said look here, I looked over to my left to Martin.

Q.  And when you looked to your left toward Martin, Officer Northcutt pepper sprayed you in the face, correct?

A. Yes.  The whole upper body, face, neck area, the whole.

Q.  Okay.  And some of the pepper spray got in your eyes also?

A.  Yes.

Q.  Okay.  Thank you.  If you can continue from where you left off.  So in my notes, I have that you left off that Officer Northcutt just pepper sprayed you and then you were hit in the face with the pepper spray can, correct?

A.  Yes.

Q.  Where in your face were you hit with the pepper spray can?

A.  I was hit on the right side of the upper eye area.

Q.  And what happened next?

A.  I backed up into the door – B section door, I backed up.  I took about one or two steps to back into B section door to try to get my eyesight.  I bent my head down and I was seeing what the wetness was, which was blood coming from my eye from the cut – a cut on my face.

17

While I was doing this – at the time I was doing this, I was being hit on the top of the head, all in the lower back area, the shoulder area. The blows came from both areas, so I would have to say it was CO Northcutt and CO Martin.

Q. As far as when you were hit in the face with the pepper spray can, did Officer Northcutt do that?

A. Yeah, it came from that area. I actually couldn't see which one did it because at that time, I had pepper spray in my face, but it came from that direction. It came from the same direction where the pepper spray came. That's where the can – the force of the metal object came from.

Q. Okay. What happened after Officers Northcutt and Martin are hitting you in back of your head and your shoulder area?

A. I had my head down, I'm trying to clear my eyes and I'm continually getting hit on the top of my head and the back of my shoulders. I stood up, I threw two punches towards CO Northcutt's area.

Q. Do you know if either of those two punches struck Officer Northcutt?

A. Yes. I'm pretty sure – one of them I know struck him - hit him. The other one, I'm not a hundred percent sure if it hit him or it hit the wall area, but I know that I hit him with my – I hit him actually with my right hand. The left hand, I wasn't sure, but could have hit him as well.

Q. Do you know where Officer Northcutt, your right hand punch hit him?

A. Well, basically I'm throwing punches. I'm not totally seeing a hundred percent where I'm punching, but I know I'm up at the head area because I'm throwing the punches straight out height-wise.

(Pltf.'s Dep. 15:7-20:2.)

Plaintiff goes on in his deposition to describe in greater detail the fight with Northcutt and Martin, the intervention of Correctional Counselor Flory, and the attempts of the other Defendants to subdue him. (Id., 20:2-24:5.) Although this testimony does establish that Defendants were acting with the intent to restrain Plaintiff after he was pepper-sprayed, it does create a triable issue of fact as to whether the initial use of pepper spray was provoked. Further,

Plaintiff testified that after he was subdued and prone, the use of force continued.

Q.  And that was going to be my next question.  When you acted like you were going to rush Officers Northcutt and Martin, you kind of – it looked like you kind of acted it out a little bit, but just so we have it on the record, and correct me if I'm wrong in describing this, okay, but it looks like you kind of lowered your shoulder and took one step towards them, is that accurate?

A.  Well, I was already lowered.  It wasn't about being lowered because Counselor Flory had grabbed my jacket when I was laying him down on the floor.  So I was already lowered.  I'm feeling the hits, the blows coming, I sad F that.

So basically what I did was I took one step with my right foot in their direction to get them off of me and then laid down on the floor.

Q.  Got it.  And when you took this one step towards Northcutt and Martin, the beating stopped, correct?

A.  Yeah.  They backed off me, exactly.

Q.  When you laid down on the floor, did you – it's called the prone position or whatever, where you lay on your stomach.

A.  Yes.  I laid in the prone position, arms straight out.

Q.   What happened next?

A.  What happened next was I started getting beat.  I started feeling – get beat in the head, the arms, the shoulders.  I heard several feet come in, several other people come in, start kicking me in the rib cage, stomping me in the back.  I started getting beat.  I was surrounded by correctional officers getting beat.

Q.  Can you give me your best estimate as to how many times you were stomped in the back?

A.  I would just be guessing.  I could not estimate.  I was being kicked in the ribs, I was being hit with sticks, I was being hit with a metal object, I was being – my left hand – fingers was being twisted.  My right hand was being bent.  I was – for me to say how many times someone stomped on my back, I would be speculating and it would just be – so I don't know.

I mean, I just do know somebody's foot kept hitting me in the lower back area.  It wasn't continuously – a person continuously stomping on me, no.  But I do remember someone's foot – because that made me tighten my stomach area so I wouldn't get nothing broke or something.  That's the only thing I could do is have my body try to accept the blows.

19

Q.  As far as the stomping that happened in your back, was it in your lower back, your upper back?

A.  It was my lower back.

Q.  As far as the stomping that beating that you took on your arms and your shoulders, was it on both of your arms and your shoulders?

A.  Yes.  I was getting beat all over my body at that time, sir.  I was getting beat in the head a lot of times.  I kept getting hit on the head area over and over in the head area, over and over.

Q.  As far as when you were kicked in the ribs, were you kicked on both sides of your ribs?

A.  Well, I was being kicked predominantly on one side more so than the other, but I was being kicked because I actually had to – Actually a few times I seen the foot with my head down because I'm covering my chin and my neck area.  You have to understand, my neck is what I was concerned about because you could get paralyzed.  I'm consciously aware that I'm getting beat right now, so I tuck my chin down and I'm tightening my body to take it.  I see the foot kept coming in and kicking me in the ribs.  What side was more than the other one, I don't know.  I was just taking the blows.

(Pltf.'s Dep. 26:9-29:15).   Although Defendants' evidence establishes that they were acting to maintain order and restore discipline, Plaintiff's testimony establishes that as he was lying prone with his hands out, he was stomped on and kicked in the ribs.  This creates a question of fact as to whether Plaintiff was subjected to excessive force after he was subdued.  Courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment.  This is not a rule specific to qualified immunity; it is simply an application of the more general rule that a "judge's function" at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Id. citing Anderson, 477 U.S. at 29.  Summary judgment is appropriate only if "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. Proc. 56(a).  In making that determination, a court must view the evidence "in the light most favorable to the opposing party."  Adickes v. S. H. Kress & Co., 398

U.S. 144, 157 (1970); see also <u>Anderson</u>, 477 U.S. at 255.  Here, the evidence, viewed in the light most favorable to Plaintiff, establishes a triable issue of fact as to whether  Plaintiff was subjected to excessive force.  A reasonable officer would not stomp and kick in the ribs a prisoner who is lying prone with his hands out.  Defendants are therefore not entitled to qualified immunity.

## VII.    <u>Conclusion</u>

Defendants Northcutt and Martin have submitted evidence that establishes, without dispute, that they did not retaliate against Plaintiff for filing and inmate grievance.  Plaintiff has not come forward with any evidence that Northcutt or Martin retaliated against him.  Judgment should therefore entered in favor of Defendants and against Plaintiff on this claim.  Plaintiff has, however, come forward with evidence that establishes a triable issue of fact as to whether Defendants subjected him to excessive force within the meaning of the Eighth Amendment.  Defendants' motion for summary judgment should therefore be denied on this claim.

Accordingly, IT IS HEREBY ORDERED that Defendants' motion for summary judgment is granted in favor of Defendants and against Plaintiff on Plaintiff's retaliation claim.  Defendants' motion for summary judgment is denied on Plaintiff's claim of excessive force.

IT IS SO ORDERED.

Dated:   **March 26, 2015**

**/s/ Gary S. Austin**

UNITED STATES MAGISTRATE JUDGE